## Case No. 11,745.

### The RHODE ISLAND.

[Olc. 505;[1] 6 N. Y. Leg. Obs. 12.]

District Court, S. D. New York. July, 1847.[2]

COLLISION—BURDEN OF PROOF—ATTEMPT TO PASS—PRIVILEGE OF LEADING VESSEL—HELL GATE—DAMAGES—PRACTICE—DECREE.

1. A decree must be in consonance with the pleadings and proofs in the cause, and evidence outside the allegations made by either party cannot be regarded in support of his charge or defence.

[Cited in Cobb v. Howard, Case No. 2,925; The Morton, Id. 9,864; The Maryland, 19 Fed. 557.]

2. In cases of tort, if the injury complained of is admitted by the answer, the burthen of proof is cast upon the defence to show affirmatively the matters of justification or defence set up.

3. When two steamboats are running in the same direction, the leading one is entitled to hold her course, and the one pursuing must at her peril select one safe to herself if she makes an attempt to pass.

[Cited in Whitridge v. Dill, 23 How. (64 U. S.) 454; The Charles Morgan, 6 Fed. 914; The Commodore Jones, 25 Fed. 509; The Jesse Spaulding, 50 Fed. 585.]

4. One steamboat cannot approach another, within a distance of twenty yards, in an attempt to run by.

[Cited in Vandewater v. Westervelt, Case No. 16,846a.]

5. The leading boat must, however, so use her privilege as not intentionally to thwart or prevent the one in the rear from using her superior speed; but is not bound by law to accommodate her by moving to either side to give her more ample room.

[Cited in The City of Macon, 47 Fed. 925.]

6. This rule equally applies to the narrow and dangerous passage in Hell Gate. The stern boat cannot compel the forward one there to make place for her, but must avoid going into the Gate, or must slack or stop her speed, if she is likely to endanger the one ahead.

7. The direct damages occasioned by a collision, and also reasonable demurrage for a period necessary to reinstate the injured vessel, will be charged upon the colliding vessel in fault.

This was an action instituted for the recovery of damages caused by a collision. The libellants allege that they are a corporation duly created by the laws of Connecticut, under the name of the "Naugatuck Transportation Company;" that they were the

[1] [Reported by Edward R. Olcott, Esq.]
[2] [Affirmed in Case No. 11,743.]

owners and proprietors of the steam propeller Naugatuck, running between the port of Derby, in Connecticut, and the port of New-York; that on the 28th day of October, 1846, the said propeller left the port of New-York, bound on her usual route through Hell Gate, Long Island Sound, for the port of Derby aforesaid; that she was then tight, strong and sound, and well manned and appointed. That while he was passing through the said Hell Gate, and had just turned a certain point therein, called Hallett's Point. the steamboat Rhode Island, on her voyage from New-York to Stonington, came up after the said Naugatuck, and with great force ran into the said propeller, doing her great damage, and endangering the lives of her passengers; that the said Rhode Island continued foul of the propeller for some time. until she backed off from her and passed on; that the said propeller is a boat of small power and slow rate of speed compared with the Rhode Island; that at the time she was run a-foul of as alleged, she was in the passage or course she was accustomed to take, and where she had a right to be; that the current was then setting against her, and was very strong, and she was laboring to make headway against the same. They further allege that the collision occurred from the negligence and inattention of the Rhode Island; that after she was so struck, her engine became powerless, and she was thereby wholly unmanageable, and at the mercy of the wind and tide, drifting among the rocks of Hell Gate until temporary sail could be set, and she was worked to Astoria ferry, where she remained until she was towed back to New-York; that she was put to the expense of being towed back to New-York, of chartering a sloop to take her cargo to Derby, of repairs, &c., all amounting to between forty-five hundred and five thousand dollars; that they have applied to the owners of the Rhode Island for remuneration, who reply that they are not liable. Wherefore they pray for a decree, &c., &c.

The claimants answering, say, that they are a corporation created under a law of New-Jersey, and owners of the Rhode Island; they deny that the Naugatuck was in every respect fit for the voyage she had undertaken, and they aver that it was owing to the unskilful and bad management of those in charge of the Naugatuck that the collision took place; they admit that the Rhode Island came up with the Naugatuck as she was passing through Hell Gate, near Hallett's Point, and that the Rhode Island came with considerable violence in collision with her, whereby the stem of the Rhode Island was wrenched off, and she suffered considerable damage. They admit that the Naugatuck is a vessel of small power; they aver that under the circumstances and the difficulties of the navigation, she was bound to use extraordinary care and precaution in noticing the approach of, and giving room to vessels of the size of the Rhode Island, and that libellants are bound to prove such care at the time of the collision. They admit that at the time of the collision the Naugatuck was nearer the south than the north shore, and that the current was setting against her, and was very strong; that she was laboring to make headway against the same. The claimants aver that her said position nearer the south than the north shore had been gained by an improper change in her course, tending to throw her in the way of and across the track of the Rhode Island; they deny that the Naugatuck, immediately before the collision, was in her usual or proper course, or which she had a right to take, or that was proper for boats of her class. They admit that the Rhode Island is a boat of sufficient power to be governed and directed in difficult navigation, and that there was room enough for her to have passed the Naugatuck without a collision, had the Naugatuck been steered in a proper manner, but that she was so badly navigated that the space for passing was obstructed and filled up.

They further allege, that arriving at Hallett's Point about twenty minutes before six, the persons engaged in the navigation of the Rhode Island were upon the look-out for other vessels and for obstructions; that the master, two pilots and wheelsman were constantly in the wheelhouse from the time of leaving the wharf until after the collision, and that they discovered the Naugatuck ahead of them, abreast of the Hell Gate ferry, the Rhode Island at that time being off Ravenswood, about half way the length of Blackwell's Island, in the channel between that island and Long Island shore; that the persons engaged as aforesaid on the look-out, in passing near Hallett's Cove, lost sight for a short time of the Naugatuck, the turpentine works on the shore, near Hell Gate, being brought between the Naugatuck and the Rhode Island; and that when the Rhode Island was abreast of the ferry, those engaged in navigating her again saw the Naugatuck, about midway of the Gate, between Hallett's Point and the rock called Hog's Back, the said Naugatuck heading at the time the course for vessels passing through the Gate; that the said Rhode Island, as is the practice in boats of her size and length, soon after passing Hell Gate ferry, began to alter her course and commenced sheering round so as to pass as close as possible to the point or turn called Hallett's Point, where the tide sets with great force towards the rocks on the opposite of the channel; that as they found the Naugatuck was moving very slow, occupying a position about midway of the Gate, so that it would be impossible for the Rhode Island to pass round to the northward or larboard side of her without imminent danger of being forced upon the rocks on that side, they determined as the only safe course for both vessels, to pass on the starboard side of said

Naugatuck; that notwithstanding all the efforts of four men at the wheel when the Rhode Island struck the current off Hallett's Point, its force was such, that she was carried off a considerable distance towards the opposite shore, the helm being all the time hard-a-port, and kept there. That the Naugatuck was then seen to alter her course, steering more across the current and to the southward; that in so doing the Naugatuck was brought in a direction tending directly across the track which the Rhode Island was taking in order to avoid the Naugatuck, and such movement rendered it impossible for the Rhode Island to do anything to prevent the collision.

They further allege, that when the master of the Rhode Island saw that a collision must take place, he promptly rung the bell to slow and stop her engine, and that when the boats came together the engine of the Rhode Island was at rest; that the collision took place with considerable violence, the Naugatuck bearing upon and across the bow of the Rhode Island so as to cause the boats to come in contact with the bow of the Rhode Island a little abaft of amidship of the Naugatuck; that they continued foul of each other four or five minutes, the Naugatuck's engine at work all the time, and the engine of the Rhode Island being kept working slowly by hand with a view of keeping the boats together, and rendering any assistance, if necessary, for the safety of those on board the Naugatuck, when the engine of the Rhode Island was backed two or three times so as to clear the boats, and she then went ahead on her way to Stonington, considerably injured by the collision.

They further allege, that the attempt of the Naugatuck to cross to the southern shore, as above stated, was improper and unnecessary, and evinced gross ignorance and bad navigation; that it was in the power of the Naugatuck to have prevented the injury; that she might have continued on her course without diverging as aforesaid, until the Rhode Island had passed, and it was her duty to have done so; that her culpable conduct occasioned the collision; or that if the collision was not the result of unavoidable accident, it was to be imputed to the heedlessness, bad management and want of skill of those navigating the Naugatuck.

They pray that the libel be dismissed with costs.

F. B. Cutting and E. H. Owen, for libellant.

A. Hamilton and W. Q. Morton, for claimant.

BETTS, District Judge. This case is presented to the court on very clear and forcible arguments by the respective counsel, and by a methodical preparation and digest of the proofs, which has most serviceably relieved the labors of the court in the examination of the points in controversy. The conclusion to which my mind is brought, on a careful study of the case, will, however, render it unnecessary to notice several particulars to which the testimony on both sides had reference, or·to discuss all the legal propositions debated between the counsel.

A cardinal principle in admiralty proceedings is, that proofs cannot avail a party further than they are in correspondence with the allegations of his pleadings, and that the decree of the court must be in consonance with the pleadings and proofs. Wood, Civ. Law, 377; [The Hoppet v. U. S.] 7 Cranch [11 U. S.] 389; Treadwell v. Joseph [Case No. 14,157; Jenks v. Lewis [Id. 7,280]; The Wm. Harris [Id. 17,695]. Whatever may be the case then upon the evidence on the one side or the other, the judgment of the court must be restrained and guided by the allegations in issue: and if they are insufficient to maintain the right of either party as established by the proofs, or the two stand in conflict, an amendment must be obtained, or the court will be compelled to pronounce its decision secundum allegata et probata, disregarding all evidence not brought within the fair and reasonable scope of the pleadings.

Another rule having important application to the present controversy is, that in cases of tort, when the party prosecuted admits the injury complained of, but sets up justificatory or excusatory matters, he takes upon himself the burden of proving affirmatively the excuse as he alleges it. Treadwell v. Joseph [supra].

The feature distinguishing this case from collisions usually the subject of litigation, is, that both vessels propelled by steam, were going in the same direction. The collision occurred in Hell Gate, in the most confined and difficult part of that dangerous passage, where the boat prosecuted would be compelled to confine herself to a very narrow track, in making head against the tide, then running ebb with great force. There was scarcely space to permit her exercising the precaution always laid upon one steamboat endeavoring to pass another, to keep off at a distance sufficient to obviate all danger of striking.

The statute law of this state imposes a penalty of $250 on every steamboat so navigated as to approach or pass another ahead of it, going in the same direction, within the distance of twenty yards. 1 Rev. St. p. 682, § 7. The Rhode Island, in this case, rightfully or from unavoidable necessity, went into the Gate and beyond Hallett's Point; it is most probable upon the proofs, that she could not have been navigated a distance of twenty yards either side of the Naugatuck, without imminent danger of being thrown upon the Hog's Back on one side, or the Pot Rock on the other. Very little over 100 feet would be left between her and those rocks, and the hazard of a slight variation in her course in stemming a rapid cur-

rent, or failing to answer her helm promptly, would make it imperative to crowd her as near to the centre of the passage as practicable, and as close to the boat ahead as she could be run. Should she sheer in either direction in passing a boat at that point, and not be controlled almost instantaneously, she would incur extreme hazard of being precipitated upon the rocks closing on each side this contracted and perilous strait, especially if compelled to diverge more than the width of a boat from midway the pass. Indeed the defence, in a good measure, is placed upon the assumption that the Naugatuck was overtaken by the Rhode Island at a point, when it was impossible, by any movement or exertion within the power of the Rhode Island, to pass her without encounter. The collision having then occurred by the act of the Rhode Island, either in running against the Naugatuck, or being so placed that the Naugatuck was inevitably driven upon her, the answer undertakes to show that the event was without fault on the part of the Rhode Island, and is ascribable to the negligence, want of skill or blameable conduct of the Naugatuck. To this end, after replying specifically to the allegations of the libel by direct or qualified denials or admissions, the answer proceeds to set forth affirmatively the facts of the case constituting the defence which the claimants intend to maintain. The specific issues so far admit the libellant's right of action as to impose on the claimants the necessity of avoiding it by establishing the excuses pleaded in the answer.

[3] [The case made by the claimants is spread out in articles 13, 14, 15, 16, 17, 18, 19, 20, 21 and 22 of the answer. After some introductory statements in respect to the management of the Rhode Island, it is asserted in articles 16 and 17, that the master pilots and mariners engaged on the look-out on board the Rhode Island, when she was abreast of the ferry, saw the Naugatuck about midway of the Gate, between Hallett's Point and the Hog's Back Rock, heading the course for vessels passing through the Gate, moving very slowly and in a position where it would be impossible for the Rhode Island to pass round to the northward or larboard side of her, without imminent danger of being swept or forced upon the rocks on that side, and they determined to pass on the starboard side, to the southward of her; and, in respect to this particular position of the Naugatuck, the answer (article 23) avers the Naugatuck might have prevented the collision by continuing on her then course without diverging, as it was her duty to have done. The answer then asserts (articles 6, 17 and 18) that the Rhode Island, in hugging close to Hallett's Point, for the purpose of avoiding the Naugatuck, and passing on her starboard side, struck the force of the current, and was carried off a considerable distance towards the opposite shore; and, just as she struck the true tide, the Naugatuck altered her course, steering more across the current, or to the southward, and, in so doing, was brought in a direction tending directly across the track or course the Rhode Island was taking, which movement rendered it impossible for the Rhode Island to do anything effectually to avoid a collision. In article 19 it is alleged that the master of the Rhode Island, seeing that a collision would take place by the change of the course of the Naugatuck, promptly stopped the engine of his boat, and when the boats came together, the engine was at rest. The collision was with considerable violence, the Naugatuck bearing upon and across the bow of the Rhode Island, and in contact with it a little abaft of midships of the Naugatuck. The answer further proceeds to charge what was incumbent on the Naugatuck to have done, and what she had power to do, under the circumstances, in prevention of the collision, and asserts (article 22) that she would have completely prevented it, by continuing on her course without diverging until the Rhode Island had passed; and that her helm might have been slightly starboarded, and sufficient room afforded the Rhode Island for passing her, but, in opposition to so doing, her course was so changed and altered, through unskilfulness and bad management, as to bring her towards and upon the Rhode Island, whereby the space which had existed for passing with entire safety was obstructed and occupied by the Naugatuck.] [3]

The answer throughout in its allegations, in reply to the charges of the libel and its affirmative averments, takes the ground that the fault of the collision was upon the Naugatuck, in omitting in two particulars to do what was incumbent on her to have done under the circumstances; first, to have edged up along the northerly side of the passage, thus opening it broadly to the boat in her rear; or, secondly, to have held her course in the middle of the stream, as she had it, when the Rhode Island struck the true tide or current; and furthermore in adopting the unjustifiable and dangerous movement of running across the bow of the Rhode Island, after the latter had approached so near that it had become impossible then to extricate her from the consequences of that improper movement.

Whatever judgments the various witnesses produced by the claimants may have expressed respecting the position and movements of the Naugatuck, and in derogation of her proper navigation, anterior to the time the Rhode Island was thrown off from Hallett's Point by the current, and struck the true tide, cannot avail the defence further than they comport with the allegations of the answer. It is the case made by the answer which the libellants are called to com-

---

bat, and not that which may be presented by the proofs when variant from or out of that stated in the pleadings. The claimants must accordingly justify the conduct of the Rhode Island, in view of the position and actings of the Naugatuck as admitted and averred by the answer. She is by it placed about midway of the Gate, between Hallett's Point and the Hog's Back, moving very slowly, and heading the course for vessels passing through the Gate. This position and course of the Naugatuck she could rightfully maintain, and the Rhode Island had no privilege or power to compel her to change either, or to interfere with her in them.

The law will not justify a vessel ahead varying her course or taking measures not indispensable to her own safety, to check or embarrass another vessel attempting to pass her. The waterway is alike common to both. But most clearly in reason, as well as upon principles of fixed law, the pursuing boat had only the privilege of such waterway as is not occupied by the leading one. That path is closed to her, and the penalty denounced by the state law for so infringing upon it as to menace danger to the boat occupying it, is only giving precision to the general principles of maritime law, by fixing the nearest allowable point of approach, and settling the consequences of a violation of the rule. 1 Rev. St. p. 682, § 7; Pard. Droit Com. § 653. The approaching vessel, when she has command of her movements, takes upon herself the peril of determining whether a safe passage remains for her beside the one preceding her, and must bear the consequences of misjudgment in that respect. The law extends no immunity to the one possessing the greater speed, and so far from encouraging the exercise of that faculty to its utmost, cautiously warns and checks vessels propelled by steam against an improvident employment of speed so as to involve danger to others being stationary or moving with less. Bulloch v. The Lamar [Case No. 2,129]; The Rose, 2 W. Rob. Adm. 1. Undoubtedly circumstances may occur, in which the leading vessel is bound to make way for the one pursuing her; such as two sailing vessels, under a gale of wind, in a narrow passage, and the rear one running up with most velocity, it would be the duty of the one ahead to give way so far as she could consistently with her own safety, in order to prevent disaster from the unmanageable condition of the other. So far as a predicament of that character has been noticed by the courts, it seems to be held, that both vessels running free, it is the duty of the leading one to give way, and for the one in pursuit to pass under her stern. Marsh v. Blythe, 1 McCord, 360.

If those considerations amount to a maritime rule, the claimants in this case would not be benefited by it; for upon their allegations, the Naugatuck was attempting the manoeuvre of keeping away, so as to bring the Rhode Island under her stern, and the Rhode Island adopted the course counteracting that effort. But in my judgment, steamboats, having the power to slack their speed, and keep back from a vessel moving ahead with less velocity, are not entitled to exact from the other any thing more than to hold her own course, or not to select and keep one calculated to thwart and impede efforts of the one approaching to pass, when another course, equally safe and convenient, is open to her.

I think, moreover, that the claimants having a full knowledge (admitted by their answer) of the position and course of the Naugatuck before making the attempt to pass her, are chargeable with the consequences of the movement, unless they have shown that movement had become inevitable, from no fault imputable to them, and consequently that the injury was unavoidable, or that the Naugatuck suddenly deviated from her course and threw herself across their track. If there was real danger to the Rhode Island in taking a course nearer the Hog's Back than the middle of the passage, she had no right to force that risk or danger on the Naugatuck, for her own ease or safety; for no testimony has made it clear that a small boat, with merely sufficient power to hold her way against the ebb, though steering with greater ease, could edge the rocks or veer about between them, by taking the tide on one bow and the other, with more security than a large one, having also in aid, on an emergency, steam force enough to drive her with high speed through an opposing tide.

The Rhode Island was unquestionably navigated skilfully and properly, on the assumption that there was room for her to pass the Naugatuck to the starboard side. She made her turn at the proper place to head the tide, and doubled Hallett's Point with great judgment and skill; but notwithstanding the strong asseveration of one of her pilots, and the opinion of other experts upon the facts stated, that she had no course safe for herself and passengers, after arriving at Flat Rock, but to press on to leeward of the Naugatuck, whatever peril such movement might bring to the latter; and to keep ahead with full power of steam, there is, in my judgment, a decided preponderance of evidence against those opinions, and it stands proved beyond all fair question, that her speed might have been slacked to the degree that only enough should be used to hold her against the tide; or that she might have been stopped and even anchored, or if imperatively necessary, she might have been brought round into the ship channel and headed back towards New-York, without advancing to the place where the Naugatuck was moving. Nor is it made by any means clear upon the proofs, that the Rhode Island herself would incur a less danger in running head on to an object moving in the middle of the passage than to

go under its stern and between it and the Hog's Back Rock.

The latter might be a critical and perilous movement for her, if she was compelled to run north of midway of the Gate; but something more than a presumed and probable danger, however imminent that might be, should be established, to justify a court in pronouncing that a heavy steamship may be plunged at the top of her power and speed, directly upon a light vessel in the middle of Hell Gate, rather than attempt a passage under her stern, and verging towards the rocks above. The notion entertained and avowed by one of the pilots, that under like emergencies he would drive the Rhode Island ahead with her full power, should the gate-way be full of vessels, if really well founded, would render navigation through that strait alarmingly perilous to life and property. Could such be the maritime right guaranteed a boat about to enter the Gate, the government would be compelled to interdict, under penalties which could not be encountered, the attempt of steamboats to crowd into the passage whilst it was occupied by other vessels. The idea, however, is totally unsupported by law, reason or usage. No principle can be deduced from either source, justifying a steamboat, under one class of circumstances, placing herself in a position to inflict injuries upon other vessels at a particular point, which does not protect her, to the like degree, in every place where she may be voluntarily navigated.

Upon the statement in the answer that the Naugatuck, as the Rhode Island came to the ferry, was about midway of the Gate, between Hallett's Point and Hog's Back Rock, heading the proper course for vessels passing through the Gate, the Rhode Island would stand without excuse in crowding upon that track so as to interfere with her, unless the claimants have succeeded in proving that the Naugatuck deviated from that course in a manner to produce the collision which ensued. This the answer asserts, and it is claimed to be supported by the testimony of Christopher Mason and Stephen and Samuel B. Manchester. The two Manchesters, captain and pilot, when the Rhode Island was abreast of Hallett's Point, observed the Naugatuck hauling to the southward, over towards the south shore. Their attention was directed to this by the second pilot saying the Naugatuck was running across their bows. Mason, the second pilot, testifies, that when the Rhode Island struck the tide at Hallett's Point, and began taking her sheer, he spoke to the captain, and told him the Naugatuck was coming directly across their bows. He says the Naugatuck kept her course across the bows of the Rhode Island until she struck. The first notice the persons at the wheel of the Rhode Island, directing her movements, thus appear to have had of the course of the Naugatuck and of the danger of the collision, was at Hallett's Point, and after she was surging off by the force of the tide towards the north side

and into the track of the Naugatuck. But Mr. Schuyler, a most intelligent witness, particularly experienced in navigation, and who at the time was alarmed at the position of the two boats, and was carefully watching their movements, says, as he passed Flood Rock he observed the Naugatuck just straightened up in the true tide half way across the Gate, and taking her course towards the south shore; and knowing that the Rhode Island could not go north of her without danger of the Hog's Back, he expected to rub her close, and walked forward to see the result. The Rhode Island had not then struck the true tide, and the Naugatuck did not appear to alter her course at all, but was edging towards the south shore.

Upon the just consideration of this testimony, it is plain that the answer is not supported in its representation that the collision was caused by a change of course made by the Naugatuck, after the Rhode Island had reached Hallett's Point. The master and pilots cannot assert it, for they were paying no attention to the movements of the Naugatuck after she straightened in the true tide, until their boat was found to be driving rapidly in her track, and then they supposed the proximity was occasioned by her sheering upon them; and Mr. Schuyler proves the contrary, as he observed her bearing southward at Flat Rock, and noticed that she did not afterwards change her direction. But the proof of the master and pilot of the Naugatuck is explicit and positive that her course was not varied south at all after she straightened in the true tide. This testimony would be the most reliable if it stood in conflict with that from on board the Rhode Island, because these witnesses speak of their own acts in navigating the Naugatuck; facts which, it is not to be supposed, they misunderstood or had forgotten, whilst the others give their opinion and judgment of her steering. And in respect to this, it is to be observed, that the latter witnesses are placed on a moving object, going with great velocity, and forced by a powerful tide out of a right line, obliquely upon the Naugatuck. They would thus lose the power of distinguishing accurately between their own movement and that of the other vessel, and would naturally regard their approach to each other promoted by seeming bearing of the Naugatuck upon them. This discordance between the inferences and judgment of one class of witnesses, so formed, and the statement of facts by those knowing them as they actually existed, showing such conclusions and inferences to be inaccurate, is not to be regarded a conflict of evidence, in any way putting in issue the veracity or intelligence of the respective witnesses.

Another fact is established by the testimony of Wheeler and Curtis, pilots of the Naugatuck, which shows that error of judgment under which the course of the Rhode Island was determined. They say the pro-

peller came to in the right tide, with her helm midships, nearer the south than the right shore of the Gate; and they and Captain Osborn all state she was on her true course, just brought into the tide, on an even helm, when the Rhode Island took her sheer at the Point, and was discerned coming upon her, and the course was not altered except by the efforts to bear up as the Rhode Island came on her. Upon the supposition that the propeller was in the middle of the Gate, Mr. Schuyler considered the Rhode Island must rub close in passing, and that her whole power of steam was necessary to carry her to starboard. Manchester, the pilot of the Rhode Island, testifies that he observed the Naugatuck straightened up, before he got to Flood Rock, and then supposed she was pretty well over to Hog's Back. Captain Manchester states that he saw her from the same place, about midway of the Gate; she seemed straight in the tide, and going round Negro Point, (which is on the north shore,) and he apprehended no danger of collision from that position of the propeller. He first discovered the danger at Hallett's Point, when he discovered her heading over towards the south shore, and, as he judged, nearly for the south side of the Pot. Christopher Mason, the second pilot, also noticed the Naugatuck from Flood Rock—saw her straighten her course, heading directly through the Gate, and, as he thought, to the northward side of the Pot, and about the usual distance from it to head the tide. These witnesses, accordingly, were managing their boat under a misapprehension of the true position of the Naugatuck, and under the supposition that the passage-way was open to them on her starboard side.

Notwithstanding the rash and startling declaration of Manchester, the pilot, that he should not have stopped or slowed his boat between Flood Rock and the Point, if he had known the actual course of the Naugatuck, and should not slow her at that place and put her in danger, to avoid running over forty thousand propellers, the conduct of the master on the occasion falsifies the ridiculous bravado, and shows that he knew it to be his duty to slow and stop his boat in the midst of the current, the instant he became aware of the hazardous proximity of the two. The misjudgment of facts on board the Rhode Island was no way induced by any improper act or omission on board the other boat, and the claimants accordingly are rendered by law responsible for its consequences. It is to be also remarked that a very slight slacking of the speed of the Rhode Island would have avoided the disaster; as although on Mr. Schuyler's estimate the engine was checked only twelve seconds, the boats were so nearly separated that the collision occurred aft of midships of the Naugatuck. This was leaving the Rhode Island under the momentum of a full head of steam; it is accordingly palpable that, if she had been run from Flood Rock with only the power necessary to her perfect safety, the Naugatuck would have been entirely out of her track, when she recovered her sheer in the Gate.

Upon these views of the case, the following decree will be entered therein: "The cause having been heard upon the pleadings and proofs in this case, and the arguments of the respective advocates thereon being carefully examined and considered, and it appearing to the court that the collision in the pleadings mentioned was occasioned by the neglect, want of due precaution and care on the part of the steamboat Rhode Island, and those conducting and managing her, and the libellants were guilty of no omission or misconduct leading thereto; it is considered by the court that the steamboat Rhode Island is liable for the damages occasioned thereby. Wherefore it is ordered and decreed by the court, that the libellants recover the damages by them sustained by means of the premises, and that the Rhode Island be condemned therefor, with costs to be taxed. It is further ordered, that it be referred to a commissioner to inquire into and ascertain the damages sustained by the libellants thereby, and for the loss of the time of their propeller whilst necessarily delayed in receiving repairs therefor, and report to the court with all convenient speed."

[NOTE. On appeal to the circuit court the decree of this court was affirmed. Case No. 11,743. The cause again came before the district court upon exceptions to the commissioner's report. The exceptions were overruled except as to the award of compensation. Id. 11,-740a. Appeal was then taken to the circuit court, where the decree of the district court was affirmed. Id. 11,744.]